Good morning. I'm Robert Dewberry, the attorney for the appellant. And I was asked to bring along the credit application so you could look at it and see a better version of what this language contains and where it is. So I did bring the original that was actually used in evidence. It was the one that came through the fax machine at Royal Plywood. And I brought some copies as well. Where's the original? I have the original one. Okay. Well, original in the sense that it's not the one that Jack Amoroso signed. It's the one that came through the fax machine. I have his signature on this. That's his signature at the bottom, yes. He signed it in his office and then he faxed it to you. And this is the original fax. That's correct. Okay. So I think it's fair to state that the one that he signed wasn't as blurry as this one because when faxes come through, there's some degeneration. So I think as far as looking at the size of the font and so forth, the language where this guarantee appears, it's at the top of page one right underneath where it says to Royal Plywood, PO Box, et cetera. So you can get an idea of how big the font is and where it appears on the page. But this is more blurry than it would have appeared to the person when they signed it because this is just a fax. And we don't have the original of what Mr. Amoroso actually signed? Do not. It was not available. It was not offered into evidence. And I thought about bringing one of these blank forms from the client along today, but since it wasn't in the evidence, I didn't feel it was right to do that. So where did the back go wrong? Well, pretty much like I said in my brief, I think that they did some second guessing. They decided on their own that they felt this language was a contract of adhesion, completely ignored the fact that this wasn't really a contract of adhesion. We had a vendor trying to get somebody's business. We had a company with $6 million in sales. They had two other vendors besides Royal. There was certainly a complete freedom of ability to contract. You know, the lumber business is a commodity, and commodity businesses are driven by price and service. Let me ask you a couple of questions about this form. Yes. Just sort of when I read this stuff. Sure. Okay. So, you know, it doesn't say contract. It says credit application. That's true. Right? And if you read it, you know, you'd think that a business person or somebody in the office might read it or at least look at the terms. You know, you're right if you see. If you bother to read the form. Yeah, okay. If you act like a businessman. The way one understands this is you're going to get credit. We're going to offer you credit for your purchases of our product on the following terms and conditions. Then you go over to the back side over here, and it has the terms on which credit will be extended. Is that right? That's true. Now, that clause at the very top on page one about Mr. Amoroso taking on personal liability for payment of any debt is not listed in here on the terms. Is that right? True. True enough. So does that create any ambiguity in this document about what was going on? Well, I think a person could read it that way if that's the way they wanted to. I can't even read the sentence at all, and I'm reading it with my glasses, and I actually can't read it, and I'm not that old. So my eyes aren't that bad. I couldn't read the line. I couldn't read the fine print in the facts, so I thought maybe this would be a little helpful. But since you have stuff here that's barely legible, and then on the back you have the terms, I mean, I don't know whether it's ambiguity or the concept is ambiguity or mutual assent, but I would think it's quite reasonable to say, okay, you can barely read this, which happens to be a very, very significant obligation to turn an obligation of a company into a personal obligation of the debtor. And it's not in the legible portion of this. Well, again, Your Honor, you're not reading what he signed. You're reading a fax transmission. I realize that, that it's still very, very, very tiny, small print on the front, and you turn to the back, it says terms, and there, that's quite legible. And it doesn't mean why would it not mention the personal guarantee and the terms, by the way? I mean, in a way, it seems like there's almost a trick to get them to sign on to the personal guarantee. It's not mentioned. Let's assume it's a trick, okay? Then you get to step two. Is it unfair? Does it shock your conscience? I'm not doing conscionability. I'm not in on conscionability. I'm in mutual assent and or ambiguity. I don't even get to conscionability. Well, I would submit that the cases are very clear. Mutual assent is a question of fact, and it can't be interfered with because you weren't there. The trial judge, he was there. He read it. He wasn't offended. He found it to be pretty simple. The standard is an offense. It's a legal standard, and it's a question of application of the law to the facts. And I have to say the facts, as found by this bankruptcy judge, were very skimpy and somewhat incoherent. Where is it? What pages are his findings on? He says, is this the bankruptcy court? Yeah. Okay. He says, I don't think the contract is ambiguous. I think California law points the way under the circle of objective tests that the debtor is bound under the guarantee in this document. Okay. Circle of objective tests. I would add that I don't agree with the premise that there was trickery or chicanery or fraud. I probably wouldn't agree with that. And there was time to read it. And there was additional time to read it. He doesn't talk about Marin and the application of the California case and whether this was the type of thing that needed to be called to Amoroso's attention. He doesn't even talk about it. He doesn't. He doesn't make that express finding. That's true. Right. So why are you telling me that I have to defer to an express finding, a fact that he did not make? Because the question of mutual assent is a fact question. He found that there was assent. I think it's a mutual question. Did he actually find a mutual assent? Did he say? Were those his exact words? No. Did he make a factual finding? No. You know, actually, when I read BAP's decision, the two-judge decision, the majority decision. Yes. I got to a point where I thought, hmm, what they're going to do is they're going to remand this to the bankruptcy court to make further findings. But instead they went on. Well, I think that they just looked at it and they said, no, we think it's too small. We don't like the way this turned out. Oh, I don't think they did that. Yeah. They might do that. That's really disrespecting the BAP. Well, I think that that was – I think that they just simply used their own judgment. I think that this language – No, no. I mean, you didn't – going back to my question, too, you know what? Yes. You could read this. You know, if one were to read this, it is a very small print, but I'm not sure that, you know, how small the print is really makes a difference for mutual assent. But – because it just says he had time to read it. You know, it is – one could say, and I think this is probably what the judges were saying, was that it's ambiguous, you know, the way this whole thing is set up. That's all. But that doesn't necessarily mean that you conclude that he isn't bound by it, even though he didn't subjectively understand. In other words, it's simply – you have to go beyond that to say this is so unfair that we simply cannot let this stand. We can't let people in business be tricked into this. I mean, why is it so unfair? Well, he didn't – Bach didn't go off on unconscionability. They went off on mutual assent. That's correct. And I think they're dead wrong when they did that because they couldn't stop there. They only performed half the analysis. What, on mutual assent? Yes, mutual assent. I think that, again, the analysis goes that you've got to then find, all right, did – is this so unfair? Is it so devoid of conscience that we can't allow this, even though the guy didn't read it or understand it? Well, is there any testimony whether he did or didn't read it? He testified he didn't read it. So it doesn't make much difference what it says. He agreed to it. He signed it. And the small print does refer both to the purchaser and the undersigned, which means the individual, right? Correct. Well, Maureen is a – talks about mutual assent, and it sets forth the role that a party cannot avoid the terms of a contract on the ground that he or she has failed to read it before signing. So that's the general rule. And then it goes on to say, an exception to this general rule exists when the writing does not appear to be a contract and the terms are not called to the attention of the recipient. In such a case, no contract is formed with respect to the undisclosed term. And it seems to me that when you set forth the terms and you don't call attention to a really pretty critical term, that it falls under the exception. Well, to me, if you put it on the front page, it's the very first thing that the person has to read. It's not like it's in page 17. It's right there. But see, what I'm saying is the reason that's an excuse or an exception to the general rule is that your agent, when sending this to them, seems to have the obligation to, because it's not a contract, to call that particular term to the attention, above and beyond just by the document itself. Well, I don't know that that's the law, Your Honor, that you have to actually say. In this case, I mean, tell me why marine storage doesn't apply to this case, to your case. Tell me how do you distinguish marine storage and tracking? Well, I think, number one, because it's on the very top of page one. It's not something that's, you know, that you have to go looking for. It's right there. And people in business do know that credit applications, they are contracts. They govern our relationship. This is how we're going to work together. I sell you stuff, you pay for it. If you have a claim, you make your claim in so much time, we're selling it, and so forth. In other words, people in business do know that a credit application is a contract. Correct. Well, that's expressly what it says anyway. Every time there's a credit transaction, these terms apply. Right? Correct. That's what it says in the first paragraph. All right. You're over your time, counsel. Thank you. Thank you. And here, let's pass these back. You can take them back. These are your best copies. Good morning, Your Honors. My name is William Bird, and I'm here on behalf of James Joseph, who is the Chapter 7 bankruptcy trustee for the estate of Jack Amoroso, Jr. I think it's important to note that the bankruptcy appellate panel did not rule that the contract was unconscionable. Are you the trustee for the signatory personally, or is it the company that's in bankruptcy? No, no. It's the individual, Your Honor. Okay. Jack Amoroso, Jr. is in a Chapter 7 proceeding. James Joseph is the Chapter 7 trustee, and he has been substituted into this proceeding as the real party in interest because the debtor has no interest in whether or not the claim is allowed or not. He has no financial interest in the outcome. The bankruptcy appellate panel held that the, or the majority of the panel, held that the contract was ambiguous. And that's really the only finding the bankruptcy court made. The bankruptcy court said, I don't find it's ambiguous. And so the bankruptcy court, finding it wasn't ambiguous, simply said he signed that it's enforceable and did not look at any of the facts or the evidence. The appellate panel found that it was ambiguous. And I think it's important to note that we're ---- The appellate panel kind of merges the analysis of mutual assent and ambiguity when it says that they say the debtor argues that because a reasonable person viewing the credit application would not believe it to be a contract for a personal guarantee and because the personal guarantee language was not called to his attention. So it's both sort of ambiguity and then reliance on the marine exception. I think that's what they did, Your Honor. I think they said because it's ambiguous, we need to look at all the facts to determine whether or not there was, in fact, mutual assent. The mere fact that it's signed doesn't mean there was. And I think it's important that this piece of paper, according to Royal Plywood, constitutes two contracts, not one. It's a contract between Royal Plywood and Audio Wood Products, Inc., setting forth the terms and conditions on which Royal Plywood will sell products to Audio Wood Products, Inc. Fine. We have no dispute about that. They contend it's also a contract between Royal Plywood and Jack Amoroso, Jr., pursuant to which Jack Amoroso, Jr. personally guaranteed any indebtedness of Audio Wood Products. And that's where the ambiguity, I think, arises. Would a reasonable person looking at this think that this was a contract for personal guarantee? Well, if you read it, you would. Read the bottom, too, where it says. Yeah, if you read it. Here you sign owner or officer signs. Or it's not valid at all, or you'll have to send it back. Well, Your Honor, it's titled. The signature line. Your Honor, it's titled credit application. It only bears a place for one signature, and it's signed by Jack Amoroso, Jr., the President. There's another signature on the next page. But that's as to the terms on the second page, Your Honor, and it was signed separately. And there's another on the last page. There is no place for an individual signature or no place where it says guarantor signature. The second page, it says owner's or officer's signature, both on the front, first and second page. I understand, Your Honor, but you're dealing with a corporation, not a sole proprietorship. If it was a sole proprietorship, there would be no need for a guarantee or, for that matter, a partnership. But we're dealing with a corporation. They knew they were dealing with a corporation. Royal Plywood's representative, Sam Eggleston, who was the only person from Royal Plywood to deal with audio wood products, had not read this document when he presented it. He did not know that there was purportedly personal guarantee language in it, but he was aware that Mr. Amoroso would not sign a personal guarantee. He nonetheless presented this document to the purchasing agent for audio wood products, Tim Best, and said, you need to get this signed before we can sell you a product. Actually, the penalty, it says, please be sure an owner or officer of the company signs this application, a non-signature by saying we'll hold up the approval. It doesn't say it won't be approved, like it's not a condition. And, in fact, Your Honor, Dana Lins, who is the president of Royal Plywood and testified at the trial, but was not involved at all in these negotiations or the presentation of this application, testified that, you know, if it was McDonnell Douglas, we don't care if the purchasing agent signs it. But if it's Joe's Lumber, then we probably want it signed by the owner. So it's not determinative. And I also think it's significant, as Your Honor noted, that on the second page, all of the terms in the very first paragraph are repeated with the exception of the personal guarantee language. I cannot read the first paragraph even with my reading glasses. Would a reasonable person looking at this as an individual, acting on behalf of a corporation, think that they were personally obligating themselves? No, if you just look at it, it says credit application. It doesn't say personal guarantee. No. Credit application and personal guarantee. You're right. But if you read it, if you read it. If you can read it. If you read it, it seems pretty clear that, you know, it's a personal guarantee as well. There's no question it says that in the very first paragraph, if you can see it. Let me add, you know, the whole notion of ambiguity under California law, is that a factual finding by the trial court judge? No, Your Honor. It's a legal finding. It's a legal issue, and it's reviewed de novo. And the mutual assent issue, isn't that a mixed question of law and fact? I believe it is. You don't the trial court never even got to that, I don't believe, because the trial court said it's not ambiguous. You signed it. End of discussion. Are you referring to the bankruptcy judge? Yes, Your Honor. Okay. He said it's not ambiguous. Yes, Your Honor. BAP said it is. BAP said it is ambiguous. And the BAP was entitled to review that, that issue, de novo. As a legal, legal determination. Exactly, Your Honor. Now, so if they find it's ambiguous, then you can look at the extraneous, whatever it's called. The underlying facts to determine whether or not there was a mutual assent. What the parties intended.  Right. And the evidence in this case is not in conflict. There's no conflicting testimony. Okay. It was faxed over or delivered by Mr. Eggleston. He hadn't read it. He knew that Amoroso wouldn't sign a guarantee. So you guys got Amoroso to sign it. So when you look at the surrounding facts, you're looking to see what the parties intended. Yes, Your Honor. Right. And did the bankruptcy court judge make findings on that? No, Your Honor. So should the BAP have remanded it to the bankruptcy court for adequate findings? I don't think that's necessary, Your Honor, because there are no disputed facts. I think what the bankruptcy court did is said it's not ambiguous, Amoroso signed it. End of discussion. But if you look at the facts, the testimony of Mr. Eggleston, that he didn't know it contained guarantee language. And, again, he was the only person representing Royal Plywood in this transaction. He presented the document to Tim Best, the purchasing agent for Audio Wood Products, never having read it, and with the knowledge that Amoroso would not sign a personal guarantee. Is this like a unilateral mistake on the part of Mr. Amoroso? He never would have signed it if he knew it was in there? I think it's mutual. I think we can characterize it as a mutual mistake because I think we can assume that Mr. Eggleston is an honest man and that Mr. Eggleston would not have included it in there if Mr. Amoroso had said I don't want that provision in there. He would not have presented the document knowing that Mr. Amoroso wouldn't sign a personal guarantee. It would have been a trickery if he did. So then if you have a mutual mistake, then what's the court supposed to do? It's not enforceable, that provision. And that's the only provision we're talking about, the enforceability of that one single provision regarding guarantee. All that and the lumber is gone, right? Pardon me, Your Honor? All that and the lumber is gone, right? I'm afraid so, Your Honor. Now, the BAP didn't decide it on mutual mistake. No, Your Honor. The BAP decided it. The appeal was based on three grounds, that there was no mutual assent, that if there was assent, it was a mutual mistake, and finally, unconscionability. The BAP did not address the final two issues and found that the contract is ambiguous and then based on the facts that there was no mutual assent. And I think based on the evidence and the record, that's the correct determination. How do you deal with the fact that he didn't read it? How does that fit into it? I don't know that it does, Your Honor, because the fact that you don't read something or a party doesn't read something, of course, is not a defense. And so from a standpoint, his intent was to sign this on behalf of the corporation. Wasn't his intent to get credit on the purchase of lumber? For the corporation. And he got credit on the purchase of lumber because he signed this document? For the corporation. And without the document, he wasn't going to get any credit? Wasn't that clear? No, Your Honor. No, Your Honor. It was not. And if he had been told, and his testimony is unrefuted in the record, if he had been told, we require a personal guarantee, they would have gone to another lumber vendor because he would not sign personal guarantees. The lumber has been delivered and disposed of and there's nothing there to secure it. No. Well, Your Honor, at any given time, Audio Wood Products, based on the testimony, had at least a minimum of three lumber vendors. And there was a high volume of business, I think it was $100,000 a month, that Mr. Eggleston, with his former employer, had been selling to Audio Wood Products. When he left his former employer and went over to Royal Plywood, he was anxious to get to business of Audio Wood Products and immediately solicited it because it was a good book of business for him. Had he told Amoroso, you've got to personally guarantee the debt of Audio Wood Products, they would have said, sorry, Sam, we're going to another vendor. We're not going to deal with Royal Plywood. But instead, he sent over what's titled credit application, which Amoroso believed he was signing on behalf of the corporation, with no knowledge that there was any personal guarantee language and no one called it a solicitation. When the solicitation was made, the vendor said, we've got to establish credit and I believe any deliveries are going to be made. And with credit references, Your Honor, for the corporation, no request for any personal financial information about Amoroso, which would be normal in the case of a personal guarantee. There was absolutely nothing that would cause a reasonable person looking at this objectively to believe that they were personally guaranteeing the obligation of the corporation by signing this document. And it was not called to Amoroso's attention. So they wanted a personal guarantee, but they didn't want to know the financial situation of the person who was guaranteeing it personally? Apparently so, Your Honor. Well, that doesn't make sense. Okay. Well, you're over your time, too. So if you have one more question. What does this do to the bankruptcy? How does this impact the bankruptcy of State? I'm just curious, just a practical matter. The distribution to creditors will be affected by the total amount of the claims. So if the claim of Royal Plywood is allowed, then that will reduce the amount of distribution to other creditors. This will not be a 100% case. It will be a percentage distribution. I do not know what that is. Okay. The trustee has a statutory duty to object to claims which appear to be objectionable. So I understand that. So if we were to uphold the BAP, Royal Plywood would get some percentage. No. It would get nothing. Nothing. If you uphold the BAP, Your Honor, then you would be finding that Royal Plywood has no claim against the bankruptcy of State. So what assets are there will be distributed among the other creditors? Well, they'd have an unsecured claim, though, wouldn't they? No, Your Honor. They didn't file? No, no. That's the whole issue is do they have a claim against this bankruptcy of State, the bankruptcy of State of Amoroso? There's no question they have a claim against Audio Wood Products. Okay. But this is not the bankruptcy of Audio Wood Products. Okay. This is the bankruptcy of just Amoroso. Yes, Your Honor. Is the corporation also in bankruptcy? No, Your Honor. The corporation did an assignment for benefit of creditors before Amoroso filed bankruptcy. I was not involved in that. It's my understanding it was new that a secured creditor got all of the assets of the corporation. Okay. Any further questions? No. All right. Royal Plywood v. Amoroso is submitted. Thank you very much, Your Honor. United States v. Ochoa Navarrete has been deferred submission. We'll take United States v. Narvaez Gomez.
judges: Beezer, Wardlaw, Paez